# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| DORA SUGRANEZ, Petitioner, | * | No. 19-1183V |
| v. | * | Special Master Christian J. Moran |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Filed: September 16, 2026 |

Phyllis Widman, Widman Law Firm, LLC, Linwood, NJ, for petitioner;
Madelyn Weeks, United States Dep't of Justice, Washington, DC, for respondent.

**DECISION ON REMAND DENYING ENTITLEMENT TO COMPENSATION**[1]

Dora Sugranez alleges that her receipt of an influenza ("flu") vaccine and/or a pneumococcal vaccine injured her shoulder. After a May 29, 2026 decision found that she was not entitled to compensation, a motion for review challenging the denial of compensation succeeded in part. The case has been remanded to evaluate whether Ms. Sugranez satisfies the regulatory definition for an on-Table injury known as "shoulder injury related to vaccine administration" ("SIRVA").

The evidence consists of Ms. Sugranez's medical records, her affidavit, reports from an expert whom petitioner retained (David M. Anapolle), reports from an expert whom the Secretary retained (Paul Cagle), and the articles the experts cited. This evidence has been re-reviewed. In addition, the parties argued their positions through briefs.

Ms. Sugranez has not established that she is entitled to compensation. As to her primary claim that she suffered SIRVA, the evidence does not support that finding. Rather, the evidence shows that in the days immediately following the flu vaccination, she suffered cellulitis.

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

## I. Events in Ms. Sugranez's Life[2]

### A. Before Vaccination

Ms. Sugranez was born in 1942. Before she received the vaccination at the age of 76 years, Ms. Sugranez worked at the Atlantic City Community College, teaching students how to deal cards. Exhibit 16 (damages aff., dated Oct. 4, 2021) ¶ 5. She stayed active by bowling, running, swimming and riding a bicycle. Id. ¶ 2; see also Pet'r's Br., filed May, 9, 2023, at 1 (describing her as "a lively and energetic individual with more zest for life than the average 80-year old).

In November 2017, Ms. Sugranez received a dose of the flu vaccine. Ex. 1 at 2; Ex. 4 at 90. Although Ms. Sugranez averred that after this vaccination she had left shoulder pain (Exhibit 15 (aff., dated Mar. 5, 2021) ¶ 3), she has not sought compensation based upon the 2017 flu vaccination.

Ms. Sugranez sought treatment from a family medicine physician, Barry Glasser, on February 28, 2018. She complained about pain from the left side of her neck down through her arm. Exhibit 4 at 76. When Dr. Glasser examined her, he found tenderness to palpation over her cervical spine and left trapezoid. Id. at 76. An X-ray showed moderate to marked disc space narrowing. Id. at 80. Dr. Glasser prescribed a medication, cyclobenzaprine, and recommended that she follow up with a physiatrist. Id. at 78. Cyclobenzaprine is given to relax painful muscle spasms. Dorland's Illus. Med. Dict. 450 (33rd ed.).

Ms. Sugranez saw an internist, Michael Dunn, on March 5, 2018. She reported "several months" of left shoulder pain that was "improving but still fairly intense." Exhibit 4 at 83. Dr. Dunn assessed Ms. Sugranez as suffering from left shoulder pain and cervicalgia. He gave her a steroid injection into her left shoulder. Exhibit 4 at 84. In a follow up visit, Ms. Sugranez reported that her pain had improved. Id. at 90-91 (Apr. 2, 2018). Later, Dr. Dunn wrote that the steroid injection improved her condition. Exhibit 12 (letter, dated Apr. 2, 2020).

The doctors whom the parties retained in the litigation differ about the duration of Ms. Sugranez's left shoulder pain. See Exhibit 26 (Dr. Anapolle's second report) at 1; Exhibit A (Dr. Cagle's report) at 6. The differences stem, in part, from additional medical records in which Ms. Sugranez sought care for a productive cough (Exhibit 4 at 97-98 (May 5, 2018)) and a bug bite (Exhibit 4 at 101-02 (June 13, 2018)). These May 5, 2018 and June 13, 2018 medical records list left shoulder pain as a problem.

---

[2] This section is copied from the May 29, 2026 Entitlement Decision. See Cottingham v. Sec'y of Health & Hum. Servs., No. 15-1291V, 2017 WL 6816709, at *1, *1 n.2 (Fed. Cl. Spec. Mstr. Dec. 12, 2017) (repeating recitation of facts in decision on remand as the Court "did not find the recitation of facts [in the original decision] to be erroneous").

**B. Vaccination and Ensuing Month**

Ms. Sugranez received the flu and pneumococcal vaccines in her left arm on August 26, 2018. Exhibit 1 at 1. Ms. Sugranez avers that: "According to the CDC if multiple vaccines are administered at a single visit, each injection should be given in a different site. Unfortunately for me the vaccine administrator did not follow the proper protocol." Exhibit 15 ¶ 2 n.1. Whether the administrator complied with the standard of care is not relevant to the outcome of Ms. Sugranez's claim in the Vaccine Program because petitioners here are not required to establish negligence.

Ms. Sugranez avers that "immediately" after her vaccinations, she felt pain and began "screaming in pain at the pharmacy." Exhibit 15 (aff., dated Mar. 5, 2021) ¶ 6; see also Exhibit 2 (aff., dated Apr. 2, 2019) ¶ 3. A record memorializing "screaming" at the pharmacy is not readily apparent within the documents filed as exhibits.

Five days after the vaccination, Ms. Sugranez told a doctor at the same practice as Dr. Dunn, Dr. Glasser, that she had redness and swelling in her left arm for four days. Exhibit 4 at 112 (Aug. 31, 2018). She also had dizziness and chills. Id. Dr. Glasser's examination revealed a large erythematous patch on her left upper arm below the site of her flu vaccination. Id. at 113. She did not have tenderness. Dr. Glasser assessed Ms. Sugranez as suffering from cellulitis. Id. at 114. Cellulitis is "an acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle. . . . It is usually caused by a wound . . . by bacteria." Dorland's Illus. Med. Dict. 321 (33rd ed.); accord Exhibit 5 at 27 (instructions for patient about cellulitis). Other assessments included pain in the left shoulder and cervicalgia. Exhibit 4 at 114. Dr. Glasser prescribed Keflex and also recommended Tylenol and Benadryl. Keflex is an antibiotic for skin infections. See Dorland's at 325 (defining cephalexin) and at 966 (defining Keflex as a trademark for preparations of cephalexin).

The next day, Ms. Sugranez sought care at the emergency department for arm pain and swelling. Exhibit 5 at 23 (Sep. 1, 2018). She stated that although she had taken two doses of Keflex, she had not improved. The doctor diagnosed her with cellulitis, arm pain, and swelling. Ms. Sugranez was given a prescription for doxycycline. Id. at 25. Doxycycline is a broad-spectrum antibiotic. Dorland's at 559.

Ms. Sugranez returned to this emergency department the next day. She reported that she had new pain around her left elbow. Her left arm pain and redness had progressed. Exhibit 5 at 104. This time, Ms. Sugranez was "admitted for cellulitis that failed outpatient antibiotics." Id.

In the hospital, various doctors treated Ms. Sugranez. Dr. Igor Oliveria found that she had "left arm rash and pruritus" but did not have joint pain. Exhibit 5 at 108 (Sep. 3, 2018). Another physical examination showed that Ms. Sugranez had normal range of motion and normal strength. Her erythema significantly improved. Id. at 112.

Ms. Sugranez was discharged from the hospital on September 5, 2018, after four days of treatment with vancomycin. Exhibit 5 at 115. Dr. Oliveria stated that Ms. Sugranez's "redness is greatly improved and no swelling [is] appreciated." Id. at 117. He instructed her to continue

her treatment with Bactrim for five days and to follow up with her primary care physician in one week. Bactrim is another antibiotic. See Dorland's at 191 (defining Bactrim as a trademarked preparation of trimethoprim and sulfamethoxazole), at 1771 (defining sulfamethoxazole) at 1937 (defining trimethoprim).

The follow-up appointment with Dr. Dunn occurred three weeks later. Exhibit 4 at 128 (Sep. 23, 2018). Ms. Sugranez told Dr. Dunn that her pain was worse, and she still had swelling and tenderness in her left upper arm. Id. at 129. Dr. Dunn referred her to a specialist in infectious diseases and a specialist in pain management. Id. at 130.

A specialist in pain management, Denise Scaringe-Dietrich, saw Ms. Sugranez on September 24, 2018. Ms. Sugranez stated that she was having pain "in her neck which radiates down her left arm." Exhibit 6 at 4. On examination, Dr. Scaringe-Dietrich detected decreased range of motion in her cervical and lumbar spine, tenderness and spasticity in her paraspinous muscle, and decreased range of motion in her left shoulder with tenderness over the proximal arm. Id. at 4-5. Dr. Scaringe-Dietrich diagnosed Ms. Sugranez as having pain in her left shoulder, neuritis, and myalgia. Dr. Scaringe-Dietrich prescribed physical therapy. She also prescribed two medications, tramadol and tizanidine. Tramadol is a medication for pain. Dorland's at 1920. Tizanidine treats muscle spasticity. Dorland's at 1903.

The first physical therapy appointment was on September 27, 2018. Exhibit 7 at 2. Ms. Sugranez reported "that after receiving a flu shot injection she had a painful reaction including swelling in her arm that she was reportedly told was cellulitis." Id. The physical therapist determined that she had mild redness and discomfort on palpation. The physical therapist also assessed her as having limited range of motion in her left arm.

### C. Remainder of 2018

Ms. Sugranez continued to see medical professionals during 2018. For example, she attended physical therapy periodically until November 14, 2018. When she stopped physical therapy, her range of motion was normal. Her pain was rated as a 3 out of 10. Exhibit 7 at 43-45.

At a return visit with the pain specialists, Ms. Sugranez stated that she had "sharp pain isolated to the bicep region." Exhibit 6 at 3 (Nov. 21, 2018). Her pain had also increased to a level of 5-6 out of 10.

### D. Medical Records from 2019, including Imaging Studies

On January 7, 2019, Ms. Sugranez saw an infectious disease specialist, Christopher Lucasti. Exhibit 3 at 5. Ms. Sugranez reported that she developed cellulitis after receiving a flu vaccination, and her "left upper arm [was] still painful and bothering her." Id. Dr. Lucasti noted that Ms. Sugranez's skin was normal without any evidence of cellulitis, and he "suspect[ed] that the immunizations may have caused some nerve damage and that may [be] the cause of her pain," but an MRI was "needed to rule out infection." Id.

A left humerus MRI performed on January 11, 2019, was normal, with no soft tissue or osseous injury at the site where Ms. Sugranez identified symptoms. Id. at 4. More specifically, the MRI showed "[n]o subcutaneous edema, fluid collection, or soft tissue mass, including the site of patient identified symptoms," "[n]o muscle edema, strain or tear," "[n]o significant tendinosis, tear or tenosynovitis," and "[n]o abnormal osseous enhancement." Id.

On February 5, 2019, Ms. Sugranez presented to Rothman Orthopedics, where she saw Dennis Nutini. Exhibit 9 at 10. Ms. Sugranez reported that after a flu vaccination six months earlier, she developed left lateral arm pain. Id. Upon exam, Ms. Sugranez had full range of motion in both shoulders but a painful arc on the left side and positive Hawkins' and Neer's tests. Id. Dr. Nutini concluded that Ms. Sugranez "had a painful injection from the flu shot that became infected. She then did not move the arm much and wound up with rotator cuff impingement." Id. at 11. Dr. Nutini administered a steroid injection and advised Ms. Sugranez to follow up in two weeks. Id.

Ms. Sugranez returned to Dr. Nutini on March 8, 2019, reporting "some relief at rest" but pain when abducting her arm. Exhibit 9 at 8. On exam, she had full range of motion in her left shoulder but positive Hawkins' and Neer's tests. Id. Dr. Nutini ordered a left shoulder MRI.

The left shoulder MRI was performed on March 15, 2019, and revealed calcific tendinosis of the supraspinatus tendon, fraying of the supraspinatus and infraspinatus tendons, "mild induration without fluid distention of the subacromial and subdeltoid bursa in keeping with mild bursitis," tendinosis of the intra-articular biceps tendon "without tear or dislocation," and acromioclavicular joint arthritis with mild spurring. Exhibit 9 at 13-14.

To discuss her MRI results, Ms. Sugranez saw Dr. Nutini on April 5, 2019. Exhibit 9 at 5. She had full range of motion; however, she reported a painful arc and she had positive Hawkins and Neer's tests. Id. at 5-6. Dr. Nutini's assessment was "left rotator cuff impingement/tendinopathy with some calcific tendinitis . . . as well as subacromial bursitis." Id. Dr. Nutini administered a subacromial steroid injection. Id.

Ms. Sugranez returned to Dr. Nutini on April 26, 2019 and reported only a 50% improvement in symptoms after her previous injection. Exhibit 9 at 3. Dr. Nutini advised Ms. Sugranez to continue with home exercises. Id. at 4.

On June 4, 2019, Ms. Sugranez reported to Dr. Nutini that she was "doing better," but still felt "mild-to-moderate" pain, rated as 5/10, with abduction of the arm and sleeping on her left side. Exhibit 9 at 15. Dr. Nutini noted that Ms. Sugranez had full range of motion of her left shoulder but a painful arc. Id. Dr. Nutini educated Ms. Sugranez about exercises to perform at the gym, and he instructed her to follow up on an as-needed basis. Id. at 16.

### E. Remaining Medical Records

Ms. Sugranez continued to seek treatment for her shoulder problems periodically. The treatment culminated in an operation to repair her rotator cuff. See Exhibit 14 at 5-6 (June 12, 2020). However, these records do not meaningfully inform the disputed issues. For details, see Pet'r's Am. Br., filed Aug. 1, 2024, at 6-7 and Resp't's Am. Br., filed Sept. 30, 2024, at 10-11.

Although Ms. Sugranez was directed to file updated medical records, see Orders, issued Nov. 29, 2022 and Mar. 9, 2023, she has not.

## II. Procedural History

### A. Initial Proceedings

Initially represented by Attorney Carol Gallagher, Ms. Sugranez initiated this case by filing a petition on August 13, 2019. The petition alleged that the flu vaccination caused "a left shoulder injury (SIRVA) or aggravation injury and cellulitis/my[o]sitis." Pet., filed Aug. 13, 2019, at preamble. The case was originally assigned to the special processing unit of the Office of Special Masters.

While in the special processing unit, Ms. Sugranez submitted additional material. The Secretary recommended that compensation be denied. Resp't's Rep., filed pursuant to Vaccine Rule 4, on Jan. 8, 2021. Thus, the case left the special processing unit in August 2021.

In September 2021, Attorney Phyllis Widman replaced Ms. Gallagher as attorney of record for Ms. Sugranez. Ms. Widman has acted as petitioner's counsel of record since that date.

About six months later, Ms. Sugranez supported her case with a first report from Dr. Anapolle. Exhibit 19. Dr. Anapolle generally opined that Ms. Sugranez suffered from SIRVA. For reasons discussed below, it bears noting that Ms. Widman supported the on-Table SIRVA claim with a report from an expert. In the ensuing status conference, Ms. Widman confirmed that Ms. Sugranez was claiming only an on-Table injury. She was not claiming an off-Table injury. Order, issued Mar. 11, 2022.

The parties further developed their positions regarding SIRVA through a series of reports from experts. See Exhibit A (Dr. Cagle's first report, filed July 5, 2022); Exhibit 25 (Dr. Anapolle's second report, filed Aug. 4, 2022); Exhibit C (Dr. Cagle's second report, filed Oct. 7, 2022); Exhibit 26 (Dr. Anapolle's third report, filed Oct. 28, 2022). The details of their opinions are presented in the analysis sections below.

The parties were instructed to advocate through briefs. This order directed the parties to state whether Ms. Sugranez met the regulatory definition of SIRVA. Order, filed Mar. 9, 2023, at 5. The March 9, 2023 order also commented that although Ms. Sugranez had pled that the vaccines caused her to suffer cellulitis, Ms. Sugranez did not present an opinion from Dr. Anapolle that her cellulitis lasted more than six months. Id. at 5 n.4.

The parties followed the March 9, 2023 order. Ms. Sugranez submitted her primary brief on May 9, 2023 and her reply on August 9, 2023. In between, the Secretary argued his position through a brief filed on July 10, 2023. Although these briefs have been reviewed, this Decision cites primarily to the amended briefs, which are discussed below.

The parties developed positions as to whether Ms. Sugranez established an off-Table injury. However, due to the denial of compensation in the First Entitlement Decision and the

denial of the motion for review on that point, any details about an off-Table claim are not relevant to assessing the on-Table claim.

Ms. Sugranez was found not entitled to compensation. For the off-Table claim, she did not establish that she suffered an infection in her bursa as Dr. Anapolle had maintained. For the on-Table claim, Ms. Sugranez was found not to have established the regulatory definition of SIRVA. More specifically, she did not establish that she had musculoskeletal pain within 48 hours of her vaccination because, in part, she did not have limited range of motion in that time. 2026 WL 1820082 (Fed. Cl. Spec. Mstr. May 29, 2026).

### B. Motion for Review and Remand Order

Ms. Sugranez disputed the outcome of her case by filing a motion for review. As previously noted, the Court disagreed with her argument regarding her off-Table claim. Opinion and Order, 2026 WL 2509134 (Fed. Cl. Aug. 25, 2026).[3] However, with respect to the on-Table claim, the Court identified a potential error in the First Entitlement Decision. The Court stated that the "special master appears to have used Ms. Sugranez's full range of motion in the immediate aftermath of the vaccine administration as evidence against a Table SIRVA." Id. at *4. The Court, thus, vacated the First Entitlement Decision's finding for the on-Table claim and remanded. In doing so, the Court offered some guidance in how to assess the on-Table claim:

> The record plainly shows that Ms. Sugranez suffered pain in her left arm both within the first forty-eight hours after the vaccine administration and after her cellulitis resolved, but it is unclear what pain began when. If cellulitis was the sole cause of Ms. Sugranez's discomfort in the first forty-eight hours and the musculoskeletal pain emerged later, then Ms. Sugranez does not have a viable Table claim. See 42 C.F.R. § 100.3(c)(10). But if, as Ms. Sugranez contends, both cellulitis-related and musculoskeletal shoulder pain began in the first forty-eight hours after receiving the vaccines, a viable Table SIRVA claim is possible.

Id. at *2.

### C. Activities on Remand

A lengthy oral argument to discuss the four SIRVA elements was held on August 20, 2026. The Secretary was directed to file a status report stating whether he was interested in participating in settlement discussions. Order, issued Aug. 21, 2026. The Secretary declined. Resp't's Status Rep., filed Sept. 4, 2026. Thus, with the completion of the argument, the matter is ready for resolution.

---

[3] The Opinion and Order was filed under seal on August 10, 2026, and published on August 25, 2026 after the redaction period lapsed.

## III. Standards for Adjudication

A petitioner is required to establish her case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV. Analysis of On-Table Claim

As the Court upheld the determination that Ms. Sugranez did not meet her burden for an off-Table claim, Ms. Sugranez's remaining claim is that she meets the regulatory definition for shoulder injury related to vaccine administration / SIRVA. Petitioners bear this burden. See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 574 (2015).

As part of his authority to place injuries on the Vaccine Table (see Terran v. Sec'y of Health & Hum. Servs., 195 F.3d 1302, 1314-15 (Fed. Cir. 1999)), the Secretary has explained what constitutes a SIRVA.

> A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Here, of the four elements of SIRVA, the parties dispute all four. See Pet'r's Am. Br. at 11-13; Resp't's Am. Br. at 13-17. Of the four items, the First Entitlement Decision reached a determination on only the second item. 2026 WL 1820082. Thus, the analysis for the first, third, and fourth points is new.

*First Element: "No history of pain . . . of the affected shoulder . . . . that would explain the alleged . . . symptoms . . . and/or diagnostic studies occurring after vaccine injection"*

Before the allegedly causal vaccination, Ms. Sugranez was treated for shoulder pain. On March 5, 2018, she told her doctor, Michael Dunn, that she had "several months" of left shoulder pain. Exhibit 4 at 83. He injected a steroid into her left shoulder. Id. at 84. Dr. Dunn later wrote that the steroid injection improved her condition. Exhibit 12 (letter, dated Apr. 2, 2020).

Tracking the language in the regulation, Ms. Sugranez argues that it is not disqualifying for a petitioner to have pain in the relevant shoulder. The pain must also "explain the alleged . . . symptoms." Pet'r's Am. Br. at 11; Tr. 6-7. This argument is sensible but does not really help her claim.

The Secretary did not contend that Ms. Sugranez's prior shoulder pain, by itself, disqualified her from SIRVA. The Secretary also relied upon the report of Dr. Cagle, who opined that the pre-vaccination pain explained the post-vaccination pain. Resp't's Am. Br. at 13-14, citing Exhibit C at 2. Thus, some evidence (in the form of an expert's report) addresses the regulatory requirement regarding "explain."

Ms. Sugranez seems to have a confusing two-part response. The first part is an argument based upon an expert. Throughout the briefing to the undersigned, Ms. Sugranez relied upon the opinion of Dr. Anapolle. See, e.g., Pet'r's Br., filed May 9, 2023, at 11; Pet'r's Am. Br., at 7. Dr. Anapolle opined that the shoulder pain for which Dr. Dunn treated Ms. Sugranez was a "left cervical radiculopathy." Exhibit 19 at 4. In other words, Ms. Sugranez, according to Dr. Anapolle, was having problem in her cervical spine (neck). Dr. Anapolle asserted "there is [a] cervical spine MRI evidence to support this." Id.

Dr. Anapolle's opinion that the pre-vaccination shoulder pain was cervical in origin is not persuasive for two reasons. First, and most fundamentally, Dr. Anapolle's opinion conflicts with how Dr. Dunn treated Ms. Sugranez. Dr. Dunn injected a steroid into her shoulder, not her neck, and stated that this "improved the condition." Exhibit 4 at 84; Exhibit 12. Dr. Dunn's perspective as a treating doctor merits careful consideration. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006). Based upon Dr. Dunn's decision to target the shoulder (rather than the neck) and the effectiveness of this treatment, it is logical to conclude that the shoulder was the source of pain. The second reason for not crediting Dr. Anapolle's opinion that Ms. Sugranez's pre-vaccination pain originated in her neck (not shoulder) is that the Dr. Anapolle's reasoning is mistaken. He stated that an "MRI" supported his position. Exhibit 19 at 4. However, as the Secretary argued, the record does not contain an MRI from around March or April 2018 showing a cervical radiculopathy. See Resp't's Br. at 11-

12. Ms. Sugranez repeated Dr. Anapolle's opinion, quoting his statement about an MRI without responding to the Secretary's argument that there appears to be no MRI. See Pet'r's Reply at 2. This mistake about the MRI reduces the reliability of Dr. Anapolle's opinion.[4]

Ms. Sugranez was asked about the basis for Dr. Anapolle's statement that an MRI showed cervical radiculopathy during the August 20, 2026 oral argument. This colloquy led to the second part of Ms. Sugranez attempt to answer Dr. Cagle's opinion that Ms. Sugranez's pre-vaccination shoulder problem explained her post-vaccination shoulder symptoms. Ms. Sugranez argued that when evaluating on-Table claims, opinions from experts should not be considered. Tr. 12 (Ms. Widman: "I don't think that the experts are . . . a piece of what's before [the special master], at this point").

This argument is frivolous, and one that an attorney with experience in the Vaccine Program should not make. The Vaccine Act requires a special master to consider "the record as a whole." 42 U.S.C. § 300aa—13(a)(1). Because Dr. Anapolle's reports and Dr. Cagle's reports are in the record, they must be considered. The statute, by itself, is a strong basis for rejecting Ms. Sugranez's argument that expert opinions should not be considered in assessing on-Table claims.

Moreover, an argument that experts are not used in on-Table cases is inconsistent with how Ms. Sugranez litigated her on-Table claim. In March 2022, when Ms. Sugranez was asserting *only* an on-Table claim, Ms. Sugranez supported her on-Table claim with Dr. Anapolle's report. Exhibit 19. Dr. Anapolle's next reports were also devoted to the on-Table claim. See Exhibit 25, filed Aug. 4, 2022; Exhibit 26, filed Oct. 28, 2022. When the parties submitted their first round of briefs, which (again) addressed only an on-Table claim, Ms. Sugranez relied upon Dr. Anapolle's reports. Pet'r's Br. at 11.[5]

Accordingly, there is no good reason to overlook the reports of Dr. Anapolle and Dr. Cagle. For the reasons explained above, Dr. Cagle's opinion that Ms. Sugranez's shoulder problem, which had been manifest before the vaccination, explains her shoulder problems after the vaccination is persuasive. Dr. Anapolle's contrary opinion lacks persuasiveness. Accordingly, Ms. Sugranez has failed to carry her burden regarding the first SIRVA element.

---

[4] To be sure, a cervical X-ray from February 28, 2018 showed degenerative disc disease. Exhibit 4 at 79. However, this imaging study was not interpreted as showing a cervical radiculopathy. Thus, even if Dr. Anapolle confused "MRI" and "X-ray," the underlying study still does not support his opinion that Ms. Sugranez's pre-vaccination pain came from her neck.

[5] After the parties finished their first round of briefing, Ms. Sugranez amended the petition to add an off-Table claim on August 1, 2024 and added a report from Dr. Anapolle at the same time. Exhibit 28. But Dr. Anapolle's opinion supporting an off-Table claim does not negate his earlier opinions supporting an on-Table claim.

This failure means that she is not entitled to receive compensation. However, the additional SIRVA elements are discussed below for the sake of completeness.

*Second Element: Pain Occurring within 48 Hours*

The First Entitlement Decision found that Ms. Sugranez did not meet this element because, in part, she had normal range of motion within a few days of the vaccination. First Entitlement Decision, 2026 WL 1820082, at *8 (citing Exhibit 5 at 108, 112). The Court held that this aspect was erroneous in that third element, which concerns range of motion, is not restricted to the first 48 hours. Opinion and Order, 2026 WL 2509134, at *4. Thus, the Court remanded for a reassessment of this issue. The Court explained that the pain associated with cellulitis must be distinguished from musculoskeletal pain. Id.

Determining what pain began when is difficult. Three different times are relevant. First, before the vaccination, as discussed in the preceding element, Ms. Sugranez suffered from musculoskeletal shoulder pain. Second, within the first 48 hours of the vaccination, Ms. Sugranez suffered from cellulitis with its attendant pain. Third, at some time more than 48 hours after the vaccination, Ms. Sugranez suffered from musculoskeletal pain. See Exhibit 6 at 4 (September 24, 2018 report of pain radiating from the neck to the left arm and a "pinching and throbbing" sensation"). The question is whether the musculoskeletal pain from the third period started within 48 hours. See Opinion and Order at *2 n.1.

The most persuasive evidence on this point is Dr. Dunn's April 2, 2020 "To Whom It May Concern" letter. Exhibit 12. In this letter, Dr. Dunn sets out two periods of time. The first, which corresponds to a period before the vaccination, is from March 5, 2018 to June 13, 2018. Dr. Dunn wrote: "The left shoulder pain during the first period was clearly of musculoskeletal etiology and she was given a corticosteroid injection which improved the condition." Id. The second period is from September 23, 2018 to January 30, 2019, which is after the August 26, 2018 vaccination. Dr. Dunn explained: "The left shoulder pain during the second time interval was clearly caused by a reaction to a vaccine that . . . resulted in an infection which was treated with antibiotics." Id. (The infection treated with antibiotics is cellulitis.) Dr. Dunn also differentiated these experiences by stating the "two episodes of left shoulder pain were clearly not related and had totally separate etiologies." Id.

This letter is credited for two reasons. First, Dr. Dunn treated Ms. Sugranez during the relevant times. He has hands-on experience with her. Second, Dr. Dunn appears to have attempted to answer the question---which pain started when.

An extensive discussion about Dr. Dunn's letter was had during the August 20, 2026 oral argument. The gist of Ms. Sugranez's argument is that because Dr. Dunn did not write something like "Ms. Sugranez did not suffer musculoskeletal pain within 48 hours of the vaccination," Dr. Dunn's letter does not foreclose a finding that she suffered musculoskeletal pain within 48 hours. This argument is not persuasive. Dr. Dunn wrote that before the vaccination, Ms. Sugranez had shoulder pain that was musculoskeletal in origin and after the vaccination, she had shoulder pain with a completely different etiology. A reasonable inference is that *pain with a musculoskeletal origin* was not present during the 48 hours after vaccination.

This finding appears consistent with Dr. Anapolle's first report. There, he wrote: "it is evident that Dora Sugranez had severe left shoulder pain with an associated cellulitis within 48 hours following the administration of a vaccine." Exhibit 19 at 4. By his words, Dr. Anapolle "associate[s]" the shoulder pain with cellulitis.

To be clear, Ms. Sugranez did experience pain at least in her arm within 48 hours of the vaccination. But this pain was due to cellulitis exclusively.[6] This finding means that Ms. Sugranez "does not have a viable Table claim." Opinion and Order, at *2.

*Third Element: "Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered"*

As the Court stated, "Ms. Sugranez experienced limited range of motion, though it was not recorded until thirty-two days post vaccination." Opinion and Order, at *4; see also Exhibit 6 at 4-5. The question is whether she experienced reduced range of motion and pain in areas other than her left shoulder.

Ms. Sugranez begins her argument under this heading by contending: "Other than describing feeling the pain as radiating, Petitioner's post-vaccination pain has been limited to her left shoulder and *bicep* area." Pet'r's Am. Br. at 13 (emphasis added). Relying, in part, on medical records noting pain in the biceps, the Secretary contends that Ms. Sugranez does not fulfill the third element. Resp't's Am. Br. at 17-18. Neither party cited any cases in which special masters discussed how bicep pain affects an analysis of the third SIRVA element. The lack of development is frustrating. See Humpfer v. Sec'y of Health & Hum. Servs., No. 22-0390V, 2025 WL 1074570, *6 (Fed. Cl. Spec. Mstr. Jan. 8, 2025) (finding that petitioner did not meet the third QAI but citing other cases in which a petitioner was found to meet the third QAI despite "stray notations of pain extending beyond the shoulder").

The experts also offer little help. Dr. Anapolle recognized that the "records describe involvement of the left upper arm," but explained that "the sequelae of an infection starting from an injection in the deltoid can spread and does not suggest that the shoulder was not involved." Exhibit 19 at 4. This reference to an infection is confusing.

Dr. Cagle fares no better. In his first report, Dr. Cagle stated: "Item 3 is not satisfied as the infection was successfully and . . . efficiently treated." Exhibit A at 5. Whether the infection was treated does not say whether Ms. Sugranez experienced pain and reduced range of motion in locations other than her shoulder. Somewhat contrary to Dr. Anapolle's opinion about the infection, Dr. Cagle continued: "With successful treatment of a skin infection, subsequent associate[d] joint pain or loss of motion would not be correlated with the infection itself. Any subsequent pain or loss of motion would be associated with the preexisting musculoskeletal issues in the shoulder." Id. at 5-6. Dr. Cagle did not comment about the bicep pain.

---

[6] Technically, Ms. Sugranez also experienced pain when the needle was inserted.

Overall, the presentation on the third element does not allow for a finding. While it might be easy to find that musculoskeletal pain in the shoulder flows to the biceps, Dr. Anapolle does not say this. Instead, Dr. Anapolle connects the "left upper arm" involvement to the infection.

Moreover, because Ms. Sugranez does not meet other SIRVA elements, any finding regarding the third element would be academic. Thus, the undersigned declines to find whether Ms. Sugranez met her burden of proof for the third SIRVA element.

*Fourth Element: "No other condition or abnormality is present that would explain the patient's symptoms"*

Resolution of this element relates back to the first element, which concerns complaints of pre-existing shoulder problems. As with the first element, Ms. Sugranez relies upon Dr. Anapolle, who said that before the vaccination, she had cervical radiculopathy, which resolved. Pet'r's Am. Br. at 13-14. However, Dr. Anapolle's opinion regarding cervical radiculopathy is not persuasive.

Dr. Cagle's account is more sensible. Dr. Cagle opined that Ms. Sugranez suffered chronic age-related changes. Exhibit A at 5-6. The basis for this opinion is that Ms. Sugranez's March 15, 2019 MRI showed problems such as acromioclavicular joint arthritis. Exhibit 9 at 13-14. In addition, the Secretary pointed to a decreased range of motion in Ms. Sugranez's cervical spine as further evidence of age-related changes. Resp't's Am. Br. at 17-18.[7]

Accordingly, the evidence preponderates in favor of finding that another condition, age-related degeneration, explains Ms. Sugranez's symptoms. Thus, Ms. Sugranez has not satisfied the fourth element.

## V. <u>Conclusion</u>

As required by the Court's August 10, 2026 Opinion and Order, the undersigned has reviewed the record again. Ms. Sugranez has not established that she meets all the SIRVA elements. Thus, she cannot receive compensation based upon an on-Table claim.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims. The Clerk's Office is further directed to provide this decision to the assigned judge pursuant to Vaccine Rule 28.1(a).

---

[7] It is not readily apparent that this argument is based upon an opinion from Dr. Cagle.

IT IS SO ORDERED.

s/Christian J. Moran
Christian J. Moran
Special Master